Your Honor, am I correct in understanding you want Seugasala to go first? Yes, and while counsel are making their way up here, let me try to stay organized. I understand that there are two AUSAs here, Mr. Collins and Ms. Farrington, with Mr. Collins taking 20 minutes on behalf of the government for Seugasala. Is that right? And then Ms. Farrington, the remaining 10 minutes. And Mr. Gunn, you're arguing on behalf of your client, Mr. Seugasala, for 20 minutes, and then I understand Ms. Hart is going to take the other 10. All right. We've got it. And so the deputy clerk has allotted time and put that time on the clock to make it easier for you to track. I'm assuming you'll want to save a little bit of time for rebuttal as well. Yes, Your Honor. With the court's permission, I'm going to try to save four of my 20 minutes for rebuttal. And as the court accurately got it, I represent Mr. Seugasala. There's actually an N that you stick in there after the U, but of course it doesn't matter. Thank you for that correction. Seugasala. Seugasala. Seugasala. I obviously, Your Honors, don't have enough time to talk about every issue I've briefed, and I'd certainly like to focus on whatever issues Your Honors have questions about or are most interested in. But with that said, I'll do a little bit of issue selection and obviously let Your Honors direct me differently if you want me to talk about other things. Let's start with what you think is your best issue. All right, Your Honor. I think my best issue and certainly the most all-encompassing issue because of the impact it has is the self-representation for RETA issue. There's no harmless error issue, obviously, to address in that context, and so it sweeps more broadly. As you might gather from my reply brief, I was struck by the government's attack on Mr. Seugasala as this person who wants to control everything. That's of particular relevance, actually, to the self-representation right because the whole point of that right is about a defendant being able to control his own destiny, to have control. And frankly, if, as the government claims, I don't necessarily agree with this, as you know from my briefs, but if, as the government claims, it's a case where the evidence is overwhelming, then frankly the right to self-representation may be about all the defendant has. And, you know, the case's talk for RETA itself talks about that, I think, respect for the individual, which is the lifeblood of the law, and that becomes all the more important if the evidence is overwhelming and that's all the defendant has. As I've argued, I don't agree the evidence is overwhelming, but certainly if it is, as the government argues, the right to self-representation becomes very important. On that issue, what do you do with the factual findings made by the court that go towards the district court's belief that the request was made for purposes of delay? He said, well, you're bringing it to the last minute. You're trying to manipulate the process. It's time to go to trial. You're a lot smarter than that, and this is a district court who's had some prior dealings with the defendant. Right, though not a lot of more prior dealings with his attorney, I think, than the defendant. But, Your Honor, my response to that is, first of all, I want to make crystal clear. The government tries to argue there's a factual finding about it being equivocal, and there's no factual finding about that. It's just about the delay. And I think, Your Honor, that factual finding just can't be upheld because Mr. Sam Gasala never asked for extra time. What the district court should have done before making that kind of finding is ask Mr. Sam Gasala, are you saying you also want a continuance? If Mr. Sam Gasala said yes to that, then perhaps that finding would be supportable. But without that finding, without that question and answer, the court couldn't make that finding. Second, Your Honor, the other thing the court could have done is it could have said, I think what it should have said in that context, is not flat out deny it, but say, well, I'll give you self-representation, but you've got to understand that you're going to trial on Tuesday or Monday or whatever the day was after the status conference. So I don't think you can support a finding like that when the defendant never asked for extra time, and you don't ask the defendant whether he's asking for extra time. So that, I think, is the response to why that finding, what the court needed to do here was basically two things. It needed to ask exactly the question I just described, and then it needed to have the phoretic colloquy. But is it conceivable that he could actually take over this case and proceed the trial in three days? Maybe, because he had been, I mean, there was a lot of things in the record that suggests he was trying to meet with and have discussions with his attorney and looking at discovery and things like that. I think he thought, now, of course, we're not talking about whether he could. We're talking about whether he thought he could, because the case law is clear that it's probably not a good idea for people to represent themselves. They're probably not going to do as good of a job, but we respect their right to make that decision. He had been involved in this case with his attorney, with multiple attorneys, for, I think, over a year, maybe going on two years. And he had had a chance to be looking at things that were filed in the case, looking at discovery, et cetera, et cetera. So maybe he could have been ready, at least as ready as he thought his attorney could be. And so I think that question did need to be asked. There's actually lots of cases out there, I think, Your Honor, in the reported cases where defendants make these requests just before trial, and they don't automatically get denied on the assumption the defendant wouldn't be ready. There also might have been an argument that the district court had to give him a little time, especially maybe doing the other trial first and this trial second, which would have been an easy thing to do. But you don't even reach that question. The district court might well have been within its discretion to say no if the request for self-representation was contingent on getting more time. But it never asked that question. It didn't know whether that was the case. It didn't know that if it said to Mr. Sam Gasala, no, I'm not giving you the extra time. Do you still want to do it? It had no idea whether he would have said yes or no to that. But in the colloquy on this issue, it appears that the defendant didn't know what he had to do. And it appeared to me the judge should have been worried about whether he was making a knowing decision here, knowing the consequences. And that's exactly why you follow up the unequivocal request, Your Honor, with a phoretic colloquy. The next thing the court would have done is go through that long speech we see in the case law about how dangerous this is and all the disadvantages of doing it and that kind of thing. If there had been that sort of phoretic colloquy, maybe Mr. Sam Gasala would have changed his mind. Maybe he wouldn't have. Maybe his need to control his destiny would have overridden what the district court told him about. But that was the other deficiency here. If there had been a phoretic colloquy, you know, there's some of the cases out there, there's actually a couple from the Tenth Circuit where they talk about vacillating. That vacillating often happens when you have the phoretic colloquy. And if there had been that sort of vacillation during the phoretic colloquy, then the court could have possibly found it was not unequivocal and denied it. But all the district court said was, quote, it's too late now, unquote. And under Ninth Circuit law, that's legally incorrect. Because under Ninth Circuit case law, it's clear the request can be made any time up to jury selection. What the court could have said is, I'm not giving you more time. Do you still want to do this? And if he said yes, okay, let me tell you what the disadvantages of this are and what a bad decision it is and try to basically talk him out of it and see if he changed his mind then. So there might well have been ultimately a proper decision in denial of self-representation here. But do you rely upon that the judge has an obligation to try to talk him out of it? Well, Phoretta and a whole bunch of Ninth Circuit case laws talk about a judge having to advise about the disadvantages of self-representation. Maybe I'm characterizing that as talk him out of it. That's not quite the way the courts phrase it. But you definitely have to tell him about all the disadvantages. But if he says, too bad, I still want to do it, Phoretta and the other cases make clear he has a right to. So that, Your Honor, of course, if we prevail on that issue, you don't need to reach any of the other issues. I did want to talk a little bit, offer a couple of thoughts, and please direct me somewhere else if you'd like me. On that issue, what would be the ruling of the court in your view? Which issue? The self-representation? Yes. That he was improperly denied his right to self-representation. The convictions have to be vacated and sent back for a new trial. Of course, it doesn't mean he's going to go free. He's just going to get a new trial. You're going on that because it would be considered structural error. It's correct. That's why, in a way, that's why I characterize that as my – I think there's other issues that are strong, but that's strongest in terms of you don't need to get into this harmless error question. Going to that sort of steps into what I was about to say first about what I think is the most significant evidentiary slash Fourth Amendment issue, the cell phone evidence. One thing I did want to make real clear up front is that the admission of the cell phone evidence was definitely not harmless error. Remember, if we're talking about the Fourth Amendment issue, it's the higher harmless error standard of harmless beyond reasonable doubt. Let me sort of lay out why that evidence was important to the government's case. Are you talking about the suppression issue or the officer talking about using this software program? I'm talking about both because either one would result in the suppression of the cell phone evidence. So there's two issues. But the admission of that evidence, first of all, was not harmless. It was very critical to the government's case because the only witnesses they had about Mr. Sam Gasol's involvement in drug trafficking activity and him being the one who had the idea of this kidnapping or assault were three, maybe four people. And every one of those three or four people was, if I can use the vernacular, dirty. First, you had two alleged co-conspirators who were trying to work off their cases. They were the ones who were caught red-handed with the drugs. Second, there's a drug user, stripper, ex-girlfriend named Mystery who admitted resenting Mr. Sam Gasol because of their breakup. And her testimony is really sort of tangential and general anyway. Third, there's an ex-felon named Bird who's testifying so he won't be prosecuted for felon in possession of a firearm. The cell phone evidence provided critical corroboration of these witnesses who on their face could certainly be attacked by the defense. Well, his defense at trial was duress. Well, only as to the kidnapping charges. Right, on the kidnapping, the most inflammatory charge. There was no contesting of the substance of the offense. Correct, as to that. There was contesting, though, and that's where Miller's testimony was important. Miller claimed that it was all Mr. Sam Gasol's idea, that he came up with this, quote, mission, unquote, like he'd done other, quote, missions, unquote. So rejection of the duress defense, whose idea it was and why Mr. Sam Gasol did this, very much depended on Miller. So first of all, Your Honor's correct that duress was the defense, but only as to those counts. And second, even as to those counts, rejection of that defense, the cell phone evidence, was important. So we have the two issues on the cell phone evidence. We have the Fourth Amendment issue. There's actually two Fourth Amendment issues, but I'm going to talk about the one that affects all the cell phone evidence, which is whether the probation condition allowed seizures as opposed to searches. First of all, I would submit that issue is preserved, that claim is preserved under this Court's case law. There is a motion. It's in excerpt of Record 948 to 950, where there's a general claim that this was a warrantless seizure, so, you know, it wasn't justified. That's enough to preserve the claim. You have two cases I give you in the briefs, one Guzman-Padilla, one Williams, where the government gets away with making very general, even different arguments in the district court, and they held, well, that preserved the claim, just because they're arguing more specific theory on appeal doesn't waive it. On the substance, you have this really well-reasoned opinion. It's not a court of appeals opinion that's binding on this Court, the swearing-in opinion, but it's a very well-reasoned, rational, logical opinion that faithfully applies this Court's precedent and the Supreme Court precedent of probation searches. One of the things that makes a probation search without a warrant and on less than probable cause, or even with probable cause but without a warrant permissible, is that you have a condition that tells the probation officer he's allowed to do it and tells the probationer that he's subject to this. The condition here said your stuff is subject to search. It didn't say seizure. And there's a big difference, especially when you're talking about a cell phone. And a good reason why a probation condition might draw that line. You seize a person's cell phone and hold it for several days or several weeks. I don't frankly use one of these smartphones yet, but people who do, it's very disruptive. It's like your whole life there is all of a sudden taken away from you for a minute. And so it's very logical that you might draw that line with a condition as it was drawn here. Okay, you say search is justified but seizure is not. Correct. How do you search without first seizing? Well, you pick up the cell phone. And I don't think that's a seizure. I agree that search implicitly allows you to hold the thing to look at it. And that's not a seizure. Well, it's not. You're depriving the owner of the possession because you want to search it. That, I would agree, is implicit in the search. But taking this thing out of the courtroom to the FBI office for a week or a month or a day or whatever it may be, that's a seizure that's not implicit in search. And you can search this thing without seizing it. What I'm having is that if a seizure, albeit you say for a short period of time, is implicit within the authority to search, how can you then start drawing lines as to how long that implicit seizure may occur? I think the way you draw the line, Your Honor, is not just time but location also. I think you draw the line by obviously you can't search something without holding it and looking through it. So that seizure has to be implicit in, quote, search, unquote. The other type of seizure does not have to be implicit in search. And this is not the type of thing where you can't search it at all without taking it to the FBI office. You can still look through everything on the cell phone that's still there. The stuff you can't do is the forensic type of search that gets into the metadata and the deleted items. So it's not like, first of all. Let me ask you this. If the probation officer wants a piece of clothing and wants to search it for DNA in possible blood that is there, are you saying that it's not implicit that the probation officer can take that piece of clothing physically away and keep it for whatever length of time it takes to do the DNA testing? Yes, I am, Your Honor, because that's a place where they'd have to say search and seizure because that's not a seizure that's implicit in an ordinary search. What this condition is basically doing is it's saying things can be searched, but they are not seized. And I think when you're talking about searches that go beyond or searches that require a seizure, in the sense of more than just holding the thing and looking at it or sticking your hand in the pocket or scrolling through. So the seizure here is a little bit less problematic, or is the seizure here a little bit less problematic than the example of Judge Murphy because there was a warrant? Well, there wasn't a warrant until in- A few days later? Well, it's not in the record. The record says later, end quote, eventually, end quote, as to the two different warrants. But it was, I think, fair to read from that days or weeks later. So they get a warrant later, but that's a product of the seizure. And especially in the case of a cell phone, cell phones, especially their metadata and deleted items, are going to change over time. Not all messages are going to be preserved. I don't know how much Your Honors know about forensic searching of computer items and cell phones, but they have this stuff, the deleted stuff is out there in this unallocated space, and it's only there until that unallocated space gets used for something else. So as you have more messages, et cetera, coming into the cell phone, the things that are in the unallocated space may not be there four days later or five weeks later or whatever the case may be. We wanted to save some time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Krista Hart on behalf of Fosavan Camdevong. My goal is to reserve two minutes for a rebuttal argument. The significant and the first question this Court must answer or address is what conspiracy was charged in Count 1, what was the scope of that conspiracy, and what did the government prove in relation to Count 1? The government in its answering brief seems to want to limit the conspiracy to only those individuals named in the indictment. That is not how the Court instructed the jury. The Court instructed the jury that if two or more people agree to commit a crime, that is a conspiracy. In instructing the jury, the Court didn't name the individuals named within the indictment, so there's no limitation for the jury in that regard. In fact, the Court instructed the jury the indictment is not evidence and does not prove anything, and there's no indication that the indictment went into the jury room. Was it read to them, though? No, not that I'm aware of. I didn't see anywhere that they read the entire indictment. And the indictment in this case included a lot of information that wasn't relevant to Mr. Camdevong. There were accounts as to Mr. Sengasala in which Mr. Camdevong wasn't charged, and that would have been irrelevant and shouldn't have gone into the jury room. And under the list of overt acts, there's overt acts as well that weren't relevant to Mr. Camdevong and shouldn't have been read to or gone into the jury room for the jury to consider. So you're saying that the judge never read the indictment to the jury? I don't recall a judge reading, like, the indictment from page 1. Did the judge summarize the indictment? Yes. Did the judge summarize the fact that the indictment involved Sion Casala, Miller, Sia Lofi, and your client? And when the court read that, he read the last clause of that sentence, and others both known and unknown to the grand jury. So it named those individuals, and it also listed others known and unknown to the grand jury. Did the indictment say that, too? Yes. So it's in the indictment that this could be, it could include other people. And so the point of that is that when the jury checked the heroin box on the indictment, on the verdict form indicating that it had found that heroin was an object of the conspiracy, it's unclear if the jury checked that box based on the Guy Camdevong conspiracy that Mr. Guy testified to at length, which was not part of the charge conspiracy, because at that point there's no indication Mr. Camdevong even knew Mr. Sion Casala. Right. But that's why he read off those names, right, asked whether the judge read off those names that we just talked about, because these folks weren't involved in that other conspiracy, right?  Oh, absolutely. The district judge told the jury this particular conspiracy involved these individuals and named them. Because when the government argued, they said, when you are looking at the verdict form and you are deciding whether to find Mr. Camdevong guilty of the conspiracy, check the heroin box based on the Camdevong-Guy conspiracy. That's what the debt was about. That's what the kidnapping was about, was collecting the bad debt. Check the heroin box. So that means the government specifically directed the jury to consider the Camdevong-Guy conspiracy as part of the overall conspiracy. But it wasn't charged. And it can't be, because there's no evidence that Mr. Camdevong even knew Mr. Sion Casala during that summer of 2011 and 2012, during that time frame when Mr. Camdevong was working with Mr. Guy. It wasn't until the end of 2012 or early 2013 that Mr. Camdevong even met or became related to the conspiracy with Mr. Sion Casala or Mr. Miller and the others. And that's important because we don't know, when the jury checked those boxes, if there was any unanimity as to what the object of the conspiracy was. If it was the heroin at issue in the Guy Camdevong, then that's a separate conspiracy that wasn't charged and that's not relevant. If it was heroin that Devin Totemoff and Mr. Miller took to Valdez on April 23rd, the government argues that that's a hypothetical conspiracy, is not part of this case, it was charged separately, and therefore that creates some confusion and we don't know what the jury decided. And that creates a bigger problem when you go to the second issue, which is the Pinkerton instruction, wherein they keep referring back to, quote-unquote, the conspiracy charged in Count 1. If you find the defendant guilty of the conspiracy charged in Count 1, then you can find the defendant guilty of Counts 2, 3, and 4 based on the Pinkerton theory of liability. But if there's multiple conspiracies in Count 1 and we don't know which conspiracy the jury found to be true, then when you use the Pinkerton theory to go back to Count 1, we don't know what the jury found. And this deprived Mr. Camdevong of his right to an unanimous jury. And so that also then impacts Count 5 because they all tie back to Count 1. Was Pinkerton argued as an alternative during closing? I don't believe the government specifically – I would have to double-check that. I don't think so, though. But the government fought for that instruction. The defense objected to it and the government fought for it and said that it was relevant and it was appropriate. And now when the government's answering brief, they argue that it's illogical. And they say, well, it's possible that the jury found Mr. Camdevong guilty of Counts 2, 3, and 4 based on a Pinkerton theory of liability. It's illogical. And if the Pinkerton instruction was illogical and not supported by the record, then I don't know why it was given, and it was erroneous to give it. And if there's two competing theories and it's possible, as the government concedes, that the jury followed an inapplicable and inappropriate theory, then the convictions have to be set aside. I'm down to about three and a half minutes, which I will save for rebuttal, unless the court has any other questions. All right. Thank you. May it please the Court. Stephen Collins on behalf of the United States. I will take the same tact as Mr. Gunn. I will address some of the issues, unless prompted by questions by the panel, on some of the issues that I believe are at the forefront of this appeal and leave some of the others on the briefing. I think, as Mr. Gunn pointed out, the question of self-representation is the question that needs to be first answered. I submit that the 75 of the 77 minutes of that Friday before trial ex parte hearing, prompted by the motion for substitution of counsel, was overwhelmingly devoted to Mr. Sucansola's fear and concern that his defense, one, was unprepared to start on Monday, but more particularly, he feared, based upon what he himself said, after reading the government's trial brief, the court would not allow him to present his duress defense. He repeated that over and over again. It was at the end, near the end of the proceeding, where after the court had ruled on the motion for relieving Mr. Lean of his role as counsel for Mr. Sugasola, after the court noted that the trial had been continued five times and that if a continuance were granted, necessarily new counsel would need at least six months, that the case was now set for trial. Mr. Sugasola's concerns about the duress defense had not been allayed because shortly before the court announced its ruling, it indicated that it might allow the duress defense to go forward. And this was after Mr. Sugasola had spent time laying out the groundwork for why he believed a duress defense should go forward. And in context of the filings before that hearing, the government had indicated it was seeking to preclude the duress defense because of an inadequate showing of why the defense should go forward. The court heard Mr. Sugasola, and before and after it ruled on the issue of representation, it indicated it might let the duress go forward. This was not an assurance for Mr. Sugasola that it would allow the defense because the court stated it would hear from the government further at the subsequent hearing. After the court left Mr. Sugasola with this uncertainty, it was about to leave the bench when Mr. Sugasola raised the issues. He raised the topic of, how does pro se work? He said that, I guess I'm asking, how does pro se work? The court simply stated, you represent yourself. Mr. Sugasola replied, yeah. The court, in response, well, what do you mean, how does it work? Mr. Sugasola said, I mean, I don't. I don't want to give the government, like, hey, I'm an idiot and I don't know how the court works. Do whatever you want to do and run all over me. If I'm pro se, do I get somebody that will help me with legal issues or am I literally just by myself? I submit the court's response, it's too late to do that, but I will give you, afford you reasonable, considerable leeway if there's something that comes up. I think I submit the court was responding to, do I get somebody that will help me with legal issues? Not that it's too late to raise the topic of pro se. Mr. Sugasola then, again, fixated, he perseverates upon the concern. But after some explanation by the court, he then says, Your Honor, all this is very confusing. I just, I don't think it's fair, and like I said, I would just rather represent myself. Does that trigger the Faretta colloquy at that point? Or at least, as counsel points out, some admonishment that are you asking or clarification that you're asking to represent yourself and if you are granted that status, you are not going to get a continuance, because up to this point he didn't say that he wanted a continuance. I appreciate the fact that it's really difficult to imagine that in a case of this magnitude, somebody could come in pro se and be ready in three days, but there was no continuance request made to the court. Is the whole colloquy appropriate, and is it error not to have that colloquy? I submit in the context of the entire proceeding, Mr. Sugasola was stating again repeatedly that he did not know if the court was going to allow the duress defense. The court said, I probably will. That's not an assurance. And I submit that when you read the subsequent, that Mr. Sugasola's true concern, interest was not going pro se, it was to get an assurance, direct assurance from the court that it would allow the duress defense. The raising of the pro se was not what he was unequivocally invoking. His right to proceed pro se was not. Are you saying that there was, in substance and effect, no request for self-representation? The raising of the pro se I submit in the context of the entire 77 minutes was not a direct invocation. It was an inquiry. It wasn't I want to proceed pro se. It was an inquiry about how does it work. I'm confused about what's going on because the government has said I don't, like on page 56, one of the issues that I just found out last night after Mr. Lean left, the government's trial recess that we haven't turned over any evidence and now we can't. Sounds like it's already crossed. I didn't know that. I think there's lots of things that I at least want to try to get in front of that jury. He was focusing upon the ability to present his duress defense, the opportunity to present his duress defense. The court has not yet told him it would because it does, and I will get to that in just a moment. But on page 57, the government said after the court tried to assuage his concern, the government said in the pretrial brief we haven't submitted one single piece of evidence. I mean I didn't even know that we had a time limit. He proceeds to say it sounds like the date passed last week and now I don't know. I mean, Your Honor, all this is confusing to me. He's talking about the duress defense, and his fear is that the court's not going to allow him to do so. So that's when he said, I know this is all confusing. I just don't think it's fair. Like I said, I believe he's referring to, I submit he's referring to the court's, the government's statement that the court should preclude the duress defense. And he said I don't think it's fair. I would rather represent myself. And then the court says quite clearly on page 58, I understand your defenses and I'm going to allow you to present them. To which Mr. Sugasala responds, I appreciate that, Your Honor. I submit that people don't express appreciation when they are denied what they're asking for. They express appreciation when they receive what they wanted. And Mr. Sugasala finally got the court to say I'm going to allow you to present the defense. And he said I appreciate that. And that was it. He got what he wanted. And he had counsel. And the court granted him the opportunity to be more involved. And so ultimately when the court issued its written statement, when the court observed that Mr. Sugasala was attempting to manipulate the process, I think the court took into account all of this. His complaints that his case wasn't ready to go on the other investigation, the interviewing of witnesses, the subpoena of witnesses, the request for further discovery tied into this concern about getting the duress defense. I believe the court justifiably felt that Mr. Sugasala ultimately was trying to game the system to get what he wanted. And that was the court to definitively say I'm going to allow you the defense without hearing from the government. Because the court did allow the duress defense. Despite what it said earlier, it was going to have the government have an opportunity to weigh in further. The court granted the duress defense. And the issue of pro se was not what he was asking for. He was not unequivocally asking to proceed pro se. He was trying to get the court to approve the duress defense. With regard to the cell phones, there are two intertwined aspects of that. And first I'll address what appears to be Mr. Gunn's primary focus, is that, as Your Honor observed, you can't search something unless you've seized it. And in this case, there was a search warrant approved, and it was executed, and the contents were therefore uncovered. But what was the gap in time between the time when it was originally seized and the warrant was issued? Well, there were two incidents of probation seizures, which I believe Mr. Gunn is focusing on. There was one from the car, the vehicle, and two, one from the residences where Mr. Sugasala was believed to be, to be his residences, the places where he was believed to be residing. The search warrant was . . . the search warrants for the phones were obtained after the second. What was the gap in time? I believe it was . . . my calendar is correct. Let's see. It may have been ten days, it may have been two weeks from the first, because I believe it was on about May 20th. But you at least concede that if the view of the defendant is accepted, that the warrant is completely irrelevant, because it was so far distanced from it. I don't agree with his assertion, because one, there was no evidence that there was . . . the evidence denigrated over a passage . . . You'd prevail. Don't you have to take the position that seizure is inherent in search? I believe so. And under the circumstances, I don't think it was an unreasonable seizure under the circumstances. Of what duration? If we do say, okay, well, in order to search, there's got to be some seizure implicit, even though the language of the probationary search condition may not have explicitly laid out seizure. But does that mean that the seizure can go on for weeks, months, how many days? I believe under the facts of this case, because this was an ongoing, continuous investigation. It wasn't, I'll get to it come Christmas, kind of, I've got other things going on. This was a continuous series of investigations. On May 20th, on the date of the encounter at the gas station, following his leaving of the probation office, he was the focus of the drug trafficking investigation. Shortly thereafter, the video was uncovered by his co-conspirator . . . the video on his co-conspirator's phone of the assault, the kidnapping video, I'll refer to it as the kidnapping video, was uncovered because the Valdez incident had already occurred. And then the probation search was scheduled shortly after it was observed that Mr. Sugusawa was the active participant in that assault. So this was a continuing, not a seize and some unrelated event interferes with the ultimate execution. This was, the case was building and building and building. And then on, so I think under these circumstances, the time lapse between the car seizure, which was limited to a certain set, and the probation search did with a different set of electronics, that it was reasonable under these circumstances. Not the, I don't think this raises an unreasonable seizure concern. I think you have to take into account each incident to see if it's reasonable under the circumstances. For instance, if, well, I'm trying to figure out an analogous circumstances on that issue. As far as . . . Well, in this circumstance, that's . . . forensic analysis. Mr. Gunn's suggestion that it could have been done curbside, literally, I think ignores the facts that Mr. Sugusawa, one, refused to give consent to the officers to search the car. There's no evidence that he was nonetheless willing to give consent to unlock the device and allow them to look through the various files, as well as to recover whatever he had himself deleted from the cell phone. So much of the material that the Cellbrite uncovered was stuff that had been deleted, either purposefully or by, as you know, first in, last out kind of process. So it would require the setting up of a forensic analysis, which ultimately was done after the search warrant was issued. Why didn't they get the warrant right away? Because I believe that they were still developing, they were obtaining the information, because there was information, despite the fact that they hadn't yet received the video, that there had been this kidnapping assault involving Mr. Sugusawa, which they were further developing. And that justifies delaying getting a warrant on the phone? I believe that part of the probable cause that, well, let's back up. I don't believe that this was an unreasonable detention or delay between the execution of the warrant from the time of the seizure, because Mr. Sugusawa's interest, proprietary interest, he never developed as having been interrupted. He's hypothetically arguing that every time that probation takes an item for further investigation necessarily implicates the proprietary interest, that it was an unreasonable infringement upon his proprietary interest. Well, no, he said that implicit in the search is the seizure that's limited in nature. So you can, you know, if you effectuate a traffic stop, you can search it right then and there. So it has to do with time as well as location. But I think the objection is in carrying somebody's iPhone away and then keeping it for some lengthy period of time. That sort of seizure is what the defense is focusing on, as I understand it. I still submit that under the circumstances, it wasn't unreasonable for them to retain it for that period between the first probation search and shortly after the second probation search where other items were searched cumulatively based upon the various search warrants for the various items. I gather his argument, though, is that you should have had a broader statement of request. In other words, you search and seize or you just search. And I think that's what he's doing. He's trying to narrow us in on the difference here. And there is a difference. I recognize that there is a difference. But in this context, the search necessarily implied a longer seizure than would have been occasioned by simply doing a curbside look at the screen because it ultimately required the use of a piece of equipment to unlock it and look at, well, not literally look at, but divulge the contents thereof. So it necessarily would have required a longer period of seizure than just simply let me see what's on the screen and what's on your recent contacts or recent calls list. So I submit that under these circumstances because of the use of the specialized equipment and that part of the delay was to apply for a search warrant. And the consequences are great. Pardon? And the consequences are great. Well, the consequences are great, but it's not critical to the ultimate case because there were multiple sources. Mr. Miller's phone was not subject to Mr. Sugasawa's constitutional interest. The testimony of the victims was not subject to the search.  Well, something caused them to think at some point, well, we need a warrant on this thing. I guess my question is why didn't that occur to them sooner rather than later? Well, I don't think they said they needed a warrant. I think they exercised due caution by applying for a warrant. Okay, I guess that's my point. Why didn't they use due caution nine days before they did? I guess then we would be facing, well, then the search wasn't caught. But that's not the question. It's not that it raises a different argument. It's why did they delay eight days, nine days to get the warrant? I think that in between that time is when they discovered the videotape, that there was an actual confirmation that aside from rumors of a sexual assault kidnapping, there was, in fact, a victim. And now this has been elevated from rumor now to hard fact that there is a crime of violence and that the case should follow constitutional norms by applying for a warrant. I understand your argument, but that may cause more problems than it doesn't because you're saying, well, now we think it's important, so we better get a warrant. That's the problem I'm having. They're damned for going for the warrant versus . . . Well, you know, it's one thing for no good going unpunished if it was a good deed that occurred a day after the actual seizure. But I'm not sure it's a good deed when it occurs ten days later. The good deed of getting the warrant. The concern is that there was something in there. Sometimes there aren't things in the boxes that investigate. I see I have . . . it looks like I've exceeded my time. Any questions? All right, let's hear from Ms. Farrington then. I'll try to get this right. I usually miss the first few lines. Good morning, Your Honors. My name is Joanne Farrington, and I represent the government in Mr. Cam Nivong's appeal here. Were you the trial counsel below as well? No, ma'am, I was not. Can you address the unanimity instruction argument where Counsel Ms. Hart was saying that during the course of, I think it was argument, the government directed the jury to the wrong conspiracy? Yes. Or created confusion as to which conspiracy, of course. To require a specific unanimity instruction, there must be a realistic possibility that the jury was confused about which of two different conspiracies might have been involved. The government does concede that there was a misstatement made by a government counsel in its closing argument as to one small piece of the overall conspiracy. In order to tick off the various elements that were required, one of which was whether or not heroin was involved in the underlying conspiracy, it mentioned the fact that the drug debt that gave rise to the kidnapping and the sexual assault was based on a heroin deal. That we concede was erroneous. The underlying possession of that heroin with intent to distribute was not part of the conspiracy in this case. But I would suggest that when you look at the record, there's no possibility that that brief mention could have confused the jury. The opening arguments of both defense counsel and the government focused on, described and focused on the indictment that was charged, the conspiracy that was charged in count one of the indictment. The evidence at trial was overwhelmingly about this one overarching conspiracy that involved Mr. Kamnivong and Mr. Segasala and others. Defense counsel misreads the answering brief. There's no suggestion that the conspiracy was limited to the named conspirators in count one, but simply that the conspiracy that was charged involved at least those conspirators plus others, named and unnamed. The, another reason why the, well, then from the evidence at trial, closing arguments again, both defense counsel, government counsel described the conspiracy that was charged in count one and told the jury that it needed to decide whether or not the defendant was guilty of that conspiracy. And perhaps most important, the district judge's instruction couldn't have been clearer. He specifically told the jury that its task was to decide if Kamnivong was a participant in the charged conspiracy, which the district court again described to the jury, and that if it found that he was involved in some other conspiracy other than that charged conspiracy, it had to acquit. And then the judge gave a unanimity instruction. Given those instructions, the jury couldn't have been confused about which conspiracy it was that they were supposed to be deciding on. And given the fact that they couldn't have been confused, there was no need for a specific unanimity instruction. And on top of the multiple conspiracy instruction and the unanimity instruction that was already given. But when the judge talks about it, the judge included not just the names in the charge conspiracy, but also the expression of those known and unknown. Yes, indeed. And there were others that were involved in that conspiracy. It was a several year conspiracy involving multiple cities in Alaska and transport of drugs from California to Alaska. There were quite a number of people involved in the conspiracy. So that was not confusing. But that was not confusing. It's not that there were a number of people involved in the conspiracy that was charged, but whether or not the victim in this case, Mr. Guy, and his prior dealings years before with Mr. Camdevong, was the charged conspiracy somehow. And there couldn't have been any confusion about that. And I would remind the court that this claim is subject to plain error review. So you're relying on the fact that there was no effect upon the substantial rights. Well, no, actually, I'm relying on the fact that there's no possibility that there was confusion here. So therefore there was no error. It was air. I'm saying it was plain, but that it did not affect the substantial right. I'm not saying that there there was not error because there did not need to be a specific unanimity charge. The defendant next raises a brand new argument, which she did not raise in the opening brief. She folds her Pinkerton liability argument into this multiple conspiracy theory. And I would suggest that that argument shouldn't be considered by the court. The only argument raised in the opening brief was that the kidnappings were outside the scope of the conspiracy, and that therefore there was insufficient evidence to support a Pinkerton theory. That's, that simply defies the evidence that was offered at trial. The kidnappings were committed by named participants in the conspiracy. They were committed to extort funds that they believed were owed to them by the victims. And they were used, intended to be used, and in fact were used by the participants to extort, to intimidate adversaries in their drug dealings in Alaska. There was plainly sufficient evidence to support the jury's verdict. Can I have you address the sentencing issue? Does the government concede that the federal kidnapping statute is not a crime of violence under the force clause? We do concede that. If it is a crime of violence, kidnapping is a crime of violence under the residual clause. So on the residual clause, then the government runs into DiMaia. We do. And we recognize that we had hoped that DiMaia would have resolved this question by this point, but obviously it didn't. And we will hope to hear from it within the next few months. I think we are all waiting for that decision. But I would like to emphasize to the Court that DiMaia is not determinative in our view of the question of the validity of the residual clause in 924C. I commend to you the analysis of the Eleventh Circuit in the O'Valley's decision, which I cited to you in a 28J letter. It was decided just two weeks ago. It's a decision that I think very plainly lays out the reasons why 924C is different. We know there's a split, but the split is really based on disagreement with the reasoning of DiMaia. I don't know how that's helpful to the government, given that you're in the Ninth Circuit. Well, the most important distinction I think that can be drawn between DiMaia and 924C is that DiMaia was based on Johnson itself. And the Johnson decision takes great pains to make clear that it intends, quote-unquote, not at all to place the validity of the language in 924C in question. The paragraph quoted at page 46 of my brief from the Supreme Court distinguishes 924C step-by-step from its conclusion in Johnson. Furthermore, to distinguish the 16B provision that was at issue in DiMaia from 924C, 924C requires the use of a weapon, of a gun. And that further narrows the scope of the statute and helps to eliminate vagueness concerns in our view. Finally, we remind the Court that this argument completely ignores the well-established rule that a defendant must establish that a statute is unconstitutionally vague as applied to his or her case, before we look to whether or not it's unconstitutionally vague on its face. We recognize that Johnson was an exception to that general rule, but that was because the Johnson court concluded that the residual clause at issue in that case was a black hole, that it had no meaning, that it was completely obscure. In this case, the provision 924C has been repeatedly litigated as to whether a particular statute is or is not a violent crime. The courts have not had any great difficulty. And in fact, the Supreme Court has specifically held that kidnapping is a crime of violence under 924C, using the residual clause. So we would suggest that there are distinctions between 924C and the 12B provision that was at issue in DiMaia. And if the Supreme Court, so that even if the Supreme Court ends up upholding DiMaia, we believe that this Court still should conclude that 924CB3 is not unconstitutionally vague. And I believe my time is up. Unless you have other questions. Thank you, Your Honors. Your Honor, I have notes on a couple of points to address here. First of all, going to what Mr. Collins ended with, the discussion about the delay in getting a warrant even after the seizure. I did want to refer the Court to page 18 of my reply brief, which sort of discusses that and makes three points that I think are relevant. First of all, the case law that does allow seizures pending getting a warrant talks about two things that are required. One, exigencies or exigent circumstances, and two, diligence in getting the warrant, which I think relates to some of the questions Your Honor, Judge Murphy was asking about. Third, there was no evidence of exigent circumstances here at all, certainly not with respect to the item seized on the June 12th search. That search was planned at least a day ahead of time and easily could have included planning to get a warrant for first, the seizure, and second, the forensic search. So I think that's important to note. This idea that somehow longer delay is more justified because they're still trying to figure things out, I think that actually goes to the issue of how they didn't have business making a seizure in the first place. So I don't think that really helps the government. It probably hurts it. On the self-representation issue, you have, I feel like the only way I can get my true side across is for me to be pro se. Quote, I would rather represent myself, unquote. Those are not equivocal statements. They might have been statements that led to a change, there might have been a change of heart if there had been a phoretic colloquy. There might have been a change of heart if they said, well, you understand, you've got to go to trial on Monday. But those things had to be inquired about and discussed. But you would concede that is the sole reference in this entire record to self-representation. Yes, it's two references. It's a discussion that, it's a colloquy that takes up four pages of transcripts, starting with the question and then ending with the I want to represent myself. Immediately after he makes what you say is a remarkable statement, and that is that I would rather represent myself, then the judge indicates that he is going to allow the defense. And instead of insisting, no, I'd still like to represent myself, Segres-Hollis says I appreciate that. Well, first he says, basically, I'm not going to allow you to represent yourself. There's two things that I think are in the response there. I mean, the request has been denied. I don't think you have to keep making, in fact, I think there's a night circuit case that may discuss this, but I don't think you have to keep making a request when the judge says no. Well, the judge is even a little equivocal about that. The judge doesn't really come out and say, I deny your request to represent yourself. In fact, the subsequent order doesn't reference anything to suggest there was a request for self-representation. Well, it's true. The subsequent order is just about the motion for a substitute counsel. Right. But he says you strike me, he's already said it's too late for that now. And then he says you strike me as a very intelligent person, and I think you're smarter than maybe you want to present, and I think that to some degree, by bringing these last minute issues, you're kind of trying to manipulate the process, so it's time to go to trial. I think he's saying no, especially when it's too late for that now was said earlier. With regard to the cell phones, we're on plain error review, is that right? No, I don't believe so, Your Honor. He raised the objection below, he raised the argument. You're talking about the Fourth Amendment? The seizure and the failure to get the warrant. I believe there was a motion filed below, and it's an excerpt, it's in the excerpted record. There's a motion filed below saying this is a warrantless seizure and there wasn't a justification for it. I think under this Court's case law, cases like the Guzman-Padilla case and the Williams case, we allowed the government to make a border search exception argument on appeal when they hadn't made that argument below, but it would make a general no probable cause required argument. There's the Williams argument where all they'd argue below was he fled, that's probable cause, and then they were allowed to argue a specific statute that made that a crime. I think this is analogous to that, so I think it was sufficiently preserved. All right, our questioning's taken you well over your time. Any additional questions, Judge Ferris, Judge Murphy? All right, thank you very much. The government argues that there could be no confusion about the guy, Cam Navone, conspiracy, and I don't understand that at all. During the instructions, the Court said regarding Count 1, the conspiracy charge, first beginning at least in or about 2010 and ending on or about November 19, 2013, there was an agreement between two or more persons to commit the crime of distribution or possession with intent to distribute controlled substances, with all of you agreeing at least one of these crimes. That does not limit it to the people named in the indictment. It doesn't limit it, so I don't understand how that eliminates the guy, Cam Navone, conspiracy from the jury's purview, considering it. And the government refers to the guy, Cam Navone, conspiracy as occurring years before, when in fact it occurred between 2011 and 2012, right in the heart of the time frame of this conspiracy. And then finally, you have the government counsel, during closing argument, directing the jury to say, check the heroin box, he used that language, check the box on the verdict form, because of the heroin at issue in the guy, Cam Navone, conspiracy. That's not part of the charged conspiracy, because it can't be, because as I said earlier, Mr. Cam Navone didn't even know Mr. Sengasala at that point. So there's no indication that these were part in the same, an overall conspiracy. And this is very similar to the controlling case here in, oh no, what is it? I'm losing it. Lapierre, where they charged one co-defendant and they named others both unknown and unknown, and they had Kanyed and Boucher, who both testified that they participated in these conspiracies, but this court found that they were two separate conspiracies, and therefore there was a genuine issue of confusion. And as to the 924C count, DiMaia is still controlling in this circuit, unless and until the Supreme Court overrules DiMaia, it is controlling. And Ninth Circuit case law has interpreted DiMaia to hold that 924C, the residual clause of 924C is unconstitutionally vague. And that's cited in my brief. The out-of-circuit cases that the government relies on regarding 924C reject the DiMaia holding. So if the Supreme Court finds in favor of DiMaia, and DiMaia 16b, the residual clause of 16b is unconstitutionally vague, then that undermines all of the arguments that the other circuits have regarding 924C. And in the context of 924C, first this court is bound by circuit precedent, but second, a 924C is a standalone charge. This is not an enhanced penalty as in the Armed Career Criminal Act, as in Johnson. This is a standalone charge. And the vagueness doctrine should apply with stronger effect, it seems to me, if you're going to attribute criminal liability based on a judge-found idea that a crime is a crime of violence, because here the judge instructed the jury it's a crime of violence. The jury doesn't get to make this decision. The judge makes the decision for the jury. Does it make any practical difference, given that counts 5 and 4 ran concurrently? The sentencing on those counts ran concurrently. It makes a difference. I mean, if you're just considering the 924C, it would be a pyrrhic victory if that were set aside. I mean, it doesn't make a difference. There's the special assessment that's attached to it. It is a conviction. But I mean, it's still significant and it's still important to get this correct, because as we all know, law changes oftentimes down the road. And just because they're run concurrently doesn't mean that at some point count 4 could be set aside. And as I've argued, the instruction as to count 4 under aiding and abetting is contrary to Supreme Court precedent. So in my view, count 4 should be set aside for a separate and distinct reason, even aside from the Pinkerton theory liability, even aside from the specific unanimity instruction, lack of instruction, which in my view infects the entire verdict. So yes, it does. All right. Thank you. Thank you very much to all counsel for your helpful briefing and argument today. The matter is submitted and we're adjourned for the week.
judges: Murphy, Farris, Nguyen